**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC,

Plaintiff,

Civil Action No.: 1:25-cv-02577

v.

THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

Defendants.

**COMPLAINT**

Plaintiff, NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC ("NASCAR" or "Plaintiff"), hereby files this Complaint against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and hereby alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., 28 U.S.C. § 1338(a)–(b), and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial internet stores operating under the Defendant Internet Stores and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents

by operating one or more commercial, interactive internet stores through which Illinois residents can purchase products bearing counterfeit versions of NASCAR's trademarks. Each of the Defendants has targeted sales from Illinois residents by operating internet stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold products bearing counterfeit versions of Plaintiff's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused NASCAR substantial injury in the State of Illinois.

## INTRODUCTION

3. This action has been filed by Plaintiff to combat online counterfeiters who trade upon Plaintiff's reputation and goodwill by selling and/or offering for sale products in connection with Plaintiff's NASCAR Trademarks, which are covered by U.S. Trademark Registration Nos. 1,908,112; 5,388,088; and 5,578,788 (collectively the "NASCAR Trademarks"). The registrations are valid, subsisting, unrevoked, and uncancelled. Additionally, the registrations are incontestable. The trademark registrations constitute prima facie evidence of their validity and of Plaintiff's exclusive right to use the trademarks pursuant to 15 U.S.C. § 1057(b). Genuine and authentic copies of the U.S. federal trademark registration certificates for the NASCAR Trademarks are attached as **Exhibit 1**. NASCAR owns a wide variety of trademarks across a broad range of classes, including, but not limited to the NASCAR Trademarks. NASCAR commercially exploits, protects, and enforces rights in the distinctive trademarks, names, logos, symbols, emblems, and other identifying indicia associated with NASCAR, including, but not limited to, the NASCAR Trademarks and those that NASCAR has adopted and used in commerce throughout the United States, including in Illinois.

4. In the past, NASCAR was able to police its marks against identifiable infringers and counterfeiters. The rise of online retailing, coupled with the ability of eCommerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken because availing itself of takedown procedures to remove infringing products would be an ineffective and endless game of whack-a-mole against the mass piracy that is occurring over the internet. Sadly, a swarm of infringers have decided to trade upon Plaintiff's reputation, goodwill, and valuable trademarks by selling and/or offering for sale products in connection with Plaintiff's trademarks. The aggregated effect of the mass counterfeiting that is taking place has overwhelmed Plaintiff and its ability to police its rights against the hundreds of anonymous defendants which are selling illegal counterfeits at prices substantially below an original.

5. To be able to offer the counterfeit products at a price substantially below the cost of the original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising, and shipping, requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.
>
> . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive

> for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.
>
> . . .
>
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 2**.

      6.      The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables counterfeiters to stymie authorities:

> The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.
>
> . . .
>
> A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.
>
> . . .

> Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

7. eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform. It formed a special task force that worked in conjunction with Chinese authorities for a boots-on-the-ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20

BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

*See* Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm (**Exhibit 3)**

8. NASCAR has been and continues to be irreparably damaged through consumer confusion, loss of control over its reputation and goodwill, as well as the quality of goods bearing the NASCAR Trademarks. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in their products to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.
>
> …
>
> The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.
>
> . . .
>
> Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.
>
> . . .
>
> Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 2)** at 4, 8, 11.

9. Not only are the creators and brand holders harmed, but the public is harmed as well:

> The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-

> commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.
>
> …
>
> The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. This illicit trade must be stopped in its tracks.

*Id.* at 3, 4. (Underlining in original).

10. Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, Schedule A shows the use of store names by the Defendant Internet Stores that employ no normal business nomenclature and, instead, have the appearance of being made up, or if a company that appears to be legitimate is used, online research shows that there is no known address for the company. Thus, the Defendant Internet Stores are using fake online storefronts designed to appear to be selling genuine Plaintiff's products, while selling inferior imitations of Plaintiff's products. The Defendant Internet Stores also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of Plaintiff's registered trademarks, as well as to protect unknowing consumers from purchasing unauthorized NASCAR Products over the internet.

11. This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and this judicial district, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and this

judicial district. In addition, each defendant has offered to sell and ship infringing products into this judicial district.

**THE PLAINTIFF**

12. Plaintiff is in the business of developing, marketing, selling, distributing, and licensing NASCAR-branded products and services. Founded in 1948, NASCAR is the foremost stock car and stock truck racing sanctioning body in North America. Each year, NASCAR sanctions over 1,500 races at over 100 tracks in 48 U.S. states, as well as in Canada, Mexico, Brazil, and Europe. Through its affiliates and partners, NASCAR sells, markets, designs, distributes, and licenses NASCAR-branded products worldwide.

13. Plaintiff's brand, symbolized by the NASCAR Trademarks, is a recognized symbol of high-quality merchandise. The NASCAR Trademarks are distinctive and identify the merchandise as goods from, or authorized by, the Plaintiff. The registrations for the NASCAR Trademarks constitute prima facie evidence of their validity and of Plaintiff's exclusive right to use the NASCAR Trademarks pursuant to 15 U.S.C. § 1057 (b). The NASCAR Trademarks have been continuously used and never abandoned.

14. Plaintiff has expended substantial time, money, and other resources in developing, advertising, otherwise promoting, and licensing the NASCAR Trademarks. As a result, products bearing the NASCAR Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from, or authorized by, Plaintiff.

**THE DEFENDANTS**

15. Defendants are individuals and business entities who, upon information and belief, primarily reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this judicial district,

through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine NASCAR Products. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit NASCAR Products to consumers within the United States, including Illinois and in this judicial district.

**THE DEFENDANTS' UNLAWFUL CONDUCT**

16. The success of the NASCAR brand has resulted in its significant counterfeiting. Defendants conduct their illegal operations through fully interactive commercial websites hosted on various eCommerce sites. Each Defendant targets consumers in the United States, including the State of Illinois, and offered to sell and, on information and belief, sold and continues to sell counterfeit products that violate Plaintiff's intellectual property rights ("Counterfeit Products") to consumers within the United States, including the State of Illinois.

17. The Defendant Internet Stores intentionally conceal their identities and the full scope of their counterfeiting operations in an effort to deter Plaintiff from learning Defendants' true identities and the exact interworking of Defendants' illegal counterfeiting operations. Through their operation of the Defendant Internet Stores, Defendants are directly and personally contributing to, inducing, and engaging in the sale of counterfeit products as alleged, often times as partners, co-conspirators, and/or suppliers. Upon information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell counterfeit products.

18. Upon information and belief, and at all times relevant hereto, the Defendants in this action have had full knowledge of Plaintiff's ownership of the NASCAR Trademarks, including Plaintiff's exclusive right to use and license such intellectual property and the goodwill associated therewith.

19. Defendants often go to great lengths to conceal their identities by often using multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. Defendants also appear to intentionally omit accurate contact information when registering their respective stores. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using at least the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities and the full scope and interworking of their massive counterfeiting operation and to avoid being shut down.

20. The counterfeit NASCAR Products for sale in the Defendant Internet Stores bear similarities and indicia of being related to one another, suggesting that the counterfeit NASCAR Products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated.

21. In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2021 U.S. Customs and Border Protection

report on seizure statistics indicated that e-commerce sales accounted for 13.3% of total retail sales with second quarter of 2021 retail e-commerce sales estimated at $222.5 billion. U.S. Customs and Border Protection, *Intellectual Property Right Seizure Statistics*, FY 2021 (https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20-%20FINAL%20%28508%29.pdf) at 23. A true and correct copy of CBP's FY 2021 report is attached hereto as **Exhibit 4**. In FY 2021, there were 213 million express mail shipments and 94 million international mail shipments. *Id*. Nearly 90 percent of all intellectual property seizures occur in the international mail and express environments. *Id* at 27. The "overwhelming volume of small packages also makes CBP's ability to identify and interdict high risk packages difficult." *Id*. at 23.

22. Further, counterfeiters such as Defendants typically operate multiple credit card merchant accounts and third-party accounts, such as, without limitation, PayPal, Inc. ("PayPal") accounts, behind layers of payment gateways so that they can continue their operation in spite of Plaintiff's enforcement efforts. Upon information and belief, Defendants maintain offshore bank accounts and regularly move funds from their PayPal or other payment processor accounts to offshore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

23. Defendants' use of the NASCAR Trademarks on or in connection with the advertising, marketing, distribution, offering for sale, and sale of the counterfeit products is likely to cause and caused confusion, mistake, and deception by and among consumers and is irreparably

harming Plaintiff. Defendants have manufactured, imported, distributed, offered for sale, and sold counterfeit products using the NASCAR Trademarks and continue to do so.

24. Defendants, without authorization or license from Plaintiff, knowingly and willfully used and continue to use the NASCAR Trademarks in connection with the advertisement, offer for sale, and sale of counterfeit products through, inter alia, the internet. The counterfeit products offered for sale by the Defendant Internet Stores are not genuine NASCAR Products. Plaintiff did not manufacture, inspect, or package the counterfeit products and did not approve the counterfeit products for sale or distribution. The Defendant Internet Stores offer shipping to the United States, including Illinois, and, on information and belief, each Defendant has sold counterfeit products into the United States, including Illinois.

25. Upon information and belief, Defendants will continue to register or acquire listings for the purpose of selling counterfeit goods that infringe upon the NASCAR Trademarks unless preliminarily and permanently enjoined.

26. Defendants' use of the NASCAR Trademarks in connection with the advertising, distribution, offering for sale, and sale of counterfeit NASCAR Products, including the sale of counterfeit NASCAR Products into Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

27. Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

28. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered NASCAR Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The

NASCAR Trademarks are highly distinctive. Consumers have come to expect the highest quality from Plaintiff's products provided under the NASCAR Trademarks.

29. Defendants have sold, offered to sell, marketed, distributed, and advertised and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the NASCAR Trademarks without Plaintiff's permission.

30. Plaintiff is the owner of the NASCAR Trademarks. Plaintiff's United States Registrations for the NASCAR Trademarks (**Exhibit 1**) are in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in the NASCAR Trademarks and are willfully infringing and intentionally using counterfeits of the NASCAR Trademarks. Defendants' willful, intentional, and unauthorized use of the NASCAR Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

31. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

32. Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and to the goodwill of its well-known NASCAR Trademarks.

33. The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit NASCAR Products.

**COUNT II**
**FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))**

34. Plaintiff repeats and incorporates by reference herein the allegations contained in the above paragraphs of this Complaint.

35. Defendants' promotion, marketing, offering for sale, and sale of counterfeit NASCAR Products created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' counterfeit NASCAR Products by Plaintiff.

36. By using the NASCAR Trademarks in connection with the sale of counterfeit NASCAR Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit NASCAR Products.

37. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit NASCAR Products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

38. Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, employees, attorneys, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

a. using the NASCAR Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine NASCAR Product or is not authorized by Plaintiff to be sold in connection with the NASCAR Trademarks;

b. passing off, inducing, or enabling others to sell or pass off any product as a genuine NASCAR Product or any other product produced by Plaintiff that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the NASCAR Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' counterfeit NASCAR Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d. further infringing the NASCAR Trademarks and damaging Plaintiff's goodwill;

e. otherwise competing unfairly with Plaintiff in any manner;

f. shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any Plaintiff's trademarks, including the NASCAR Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof; and

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Internet Stores, or any other online marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit NASCAR Products;

2) That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiff a written report

under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through g, above;

    3) Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces, social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing, and Yahoo, web hosts for the Defendant Internet Stores, and online marketplace account registrars, shall:

    a. disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit NASCAR Products using the NASCAR Trademarks, including any accounts associated with the Defendants listed on Schedule A;

    b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit NASCAR Products using the NASCAR Trademarks; and

    c. take all steps necessary to prevent links to the Defendant Internet Stores identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Internet Stores from any search index;

    4) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the NASCAR Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

    5) In the alternative, that Plaintiff be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the NASCAR Trademarks;

    6) That Plaintiff be awarded its reasonable attorneys' fees and costs;

    7) Award any and all other relief that this Court deems just and proper.

DATED: March 12, 2025

Respectfully submitted,

*/s/ Keith A. Vogt*
Keith A. Vogt (Bar No. 6207971)
Keith Vogt, Ltd.
33 West Jackson Boulevard, #2W
Chicago, Illinois 60604
Telephone: 312-971-6752
E-mail: keith@vogtip.com

***ATTORNEY FOR PLAINTIFF***